IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAMONT HAGAN,** | : | CIVIL ACTION NO. 1:20-CV-2335 |
| Petitioner | : | (Judge Conner) |
| v. | : | |
| **PENNSYLVANIA BOARD OF PROBATION AND PAROLE, ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, JOHN WETZEL, LAUREL HARRY, CUMBERLAND COUNTY DISTRICT ATTORNEY,** | : | |
| Respondents | : | |

## **MEMORANDUM**

Petitioner Damont Hagan ("Hagan") is an inmate who is presently incarcerated at the State Correctional Institution in Camp Hill, Pennsylvania ("SCI-Camp Hill"). He initiated the above-captioned action on December 14, 2020, by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). In his petition, Hagan contends that he is at risk of contracting COVID-19 and that the COVID-19 precautions being taken at SCI-Camp Hill are damaging to his health. Respondents filed a motion to dismiss the habeas petition. (Doc. 13). Hagan subsequently filed several supplements to the petition, (Docs. 19, 26, 31, 32), the effect of which comingles his claims regarding inadequate COVID precaution with claims that the Pennsylvania Board of Probation and Parole (the "Board" or "Parole Board") has improperly denied him a hearing and improperly denied him release on parole. The matter is fully briefed and ripe for disposition. For the

reasons set forth below, the court will grant respondents' motion and dismiss the habeas petition.

I. **Factual Background & Procedural History**

    A. **Facts Regarding Hagan**

Hagan is currently serving a sentence of fifteen (15) to forty (40) years' incarceration imposed by the Court of Common Pleas of Allegheny County, Pennsylvania for third degree murder. (Doc. 1 at 4). In November 2019, Hagan became eligible for parole. (Id.) On May 22, 2020, the Board denied Hagan parole. (Id. at 5). The following factors were invoked by the Board to deny Hagan parole: (1) his institutional behavior, including reported misconducts; (2) his risk and needs assessment indicating his level of risk to the community; and (3) the negative recommendation made by the Department of Corrections ("DOC"). (Id.; Doc. 26 at 11). The Board further noted that at Hagan's next interview, they would review Hagan's file and consider: (1) his compliance with DOC ordered mental health services; (2) whether he has received a favorable recommendation for parole from the DOC; (3) whether he has received a clear conduct record; and (4) whether he has completed the DOC prescriptive programs. (Doc. 26 at 11-12). Hagan asserts that the Board failed to consider his mental health and the manner in which his mental health has been affected by COVID-19. (Doc. 1 at 4, 12-13). Hagan is not eligible to see the Parole Board again until May 2022. (Id.; Doc. 26 at 11).

On August 5, 2020, Hagan submitted a request slip to Superintendent Harry stating that the institution lockdown exacerbated his mental health conditions and

2

that cell searches conducted by prison staff increased his risk for contracting COVID-19. (Doc. 1 at 8).

From April 2020 through November 2020, Hagan contends that inmates on K-block at SCI-Camp Hill were required to eat meals in their cells, they could leave their cells for thirty (30) to one hundred twenty (120) minutes per day, and they were not provided any unit treatment groups. (Id. at 8-9). Additionally, from August 31, 2020 through September 7, 2020, SCI-Camp Hill was on lockdown. (Id. at 9). During this time, Hagan avers that inmates remained in their cells for twenty-four (24) hours a day, and inmates on K-block did not receive any mental health checks. (Id. at 9-10).

On September 14, 2020, certain inmates on K-block tested positive for COVID-19 and the unit was again placed on lockdown. (Id. at 10). The lockdown continued through September 29, 2020. (Id.) Inmates were only allowed to leave their cells for fifteen (15) minutes a day. (Id.) On September 23, 2020, Hagan was treated by mental health staff. (Id.) He allegedly reported feelings of depression, suicidal ideations, thoughts of self-mutilation, and abstaining from food. (Id.) Hagan contends that staff failed to offer any assistance. (Id.)

On November 10, 2020, more than twenty-five (25) inmates were placed on K-block and allegedly did not undergo any COVID-19 screening. (Id.) Four (4) days later, inmates on K-block tested positive for COVID-19 and the unit was placed on lockdown through December 10, 2020. (Id.) During a twenty-four (24) hour span, inmates were permitted fifteen (15) minutes out of their cells. (Id. at 11). Hagan reported thoughts of suicide, hopelessness and self-mutilation, lack of appetite,

3

trouble sleeping, difficulty concentrating, severe irritation, and a belief that prison staff were intentionally attempting to expose him to the COVID-19 virus. (Id.) He claims that he is more susceptible to contracting COVID-19 due to "heart issues and other physical health problems." (Id.)

After filing his petition—specifically on February 25, 2021—Hagan purportedly tested positive for COVID-19. (Doc. 19-1 at 1). He suffered from dizziness, fatigue, and a fever, and lack of taste, smell, and appetite. (Id. at 2). He was placed in isolation. (Id.) Correctional officers checked on Hagan every forty-five (45) minutes, but he was never treated by mental health staff. (Id. at 2-3). Hagan alleges that he attempted suicide on February 27, 2021. (Id. at 3).

On May 23, 2021, Hagan filed an application for parole. (Doc. 26 at 5). On June 8, 2021, the Board denied his request for review. (Id. at 7). The Board advised Hagan that, pursuant to 61 Pa.C.S. § 6139, it is not required to consider an inmate's application for parole submitted within three (3) years of the date of a parole decision if the offender was sentenced under, *inter alia*, 18 Pa.C.S. § 2502(c) (relating to murder). (Id.) Hagan ostensibly filed another application for parole in July 2021. (Doc. 32-1 at 2).

In his most recent supplement to his petition filed August 16, 2021, Hagan asserts that because he is not vaccinated against COVID-19, he must remain in his cell for twenty-two (22) or twenty-three (23) hours per day, he cannot work or attend groups, he is not permitted contact visits with family, and he cannot attend outside yard. (Id. at 1-2).

4

Hagan further alleges that Parole Board members are not qualified to make determinations regarding his physical or mental health conditions and how they are affected by COVID-19 precautions. (Doc. 1 at 12-13; Doc. 19-1 at 4). He alleges that by not granting him parole, Board members are "acquiescing in retaliatory conduct" in violation of his First Amendment rights. (Doc. 1 at 14). For relief, Hagan seeks a writ of habeas corpus, and an order directing the DOC and the Parole Board to consider his mental health conditions and create a release plan designed to rehabilitate and protect his mental health. (Id. at 17). In his supplements to the habeas petition, Hagan seeks a court order directing the Parole Board to accept his May 23, 2021 application for parole and to immediately release him from custody. (Doc. 19-1 at 4; Doc. 26 at 3; Doc. 26-1 at 5; Doc. 31-1 at 4).

**B.     Summary of the DOC's Response to COVID-19**

The DOC has provided publicly available information regarding its response to the COVID-19 pandemic. See COVID-19 and the DOC, https://www.cor.pa.gov/Pages/COVID-19.aspx (last visited Jan. 31, 2022). In-person visitation has been suspended since March 13, 2020. Id. Visitation resumed at select facilities in May 2021. Id. However, in-person visitation was again suspended at all state correctional institutions from January 27, 2022 through February 28, 2022 due to the surge of COVID-19 cases throughout the state. See Inmate Visitation, https://www.cor.pa.gov/family-and-friends/Pages/Inmate-Visitation.aspx (last visited January 31, 2022).

"All inmates are being screened coming in and going out," and the DOC is not accepting inmates with flu-like symptoms from county institutions. See COVID-

5

19 and the DOC, https://www.cor.pa.gov/PAges/COVID-19.aspx (last visited Jan. 31, 2022). The DOC has provided inmates with disposable masks and "strongly encourage[s] inmates" to use them. Id. Moreover, inmates are "provided materials to clean their cell daily. Materials will be provided to them on a daily basis." Id. Institutions are conducting town hall meetings with inmates "to review sanitation guidelines and COVID-19 information for awareness." Id. Correctional Industries has increased the production of anti-bacterial soap, and soap is provided free of charge to all inmates. Id. Additionally, Correctional Industries "has made soap, masks, towels and anti-bacterial spray to ensure all inmates and staff have sufficient supply throughout the institution." Id. As of January 31, 2022, there are 98 active inmate cases of COVID-19 at SCI-Camp Hill. Id. (select "COVID-19 Dashboard" hyperlink and search for SCI-Camp Hill). There have been 1,053 inmate cases overall, with 5 deaths. Id. 21,975 inmates have been tested. Id. As of January 31, 2022, there are 44 active staff cases, with 453 cumulative staff cases. Id.

With respect to staff members, all facilities conduct "enhanced screening for all individuals entering a facility. No one will be permitted to enter a facility who has a fever over 100 degrees or exhibits signs of cold or flu." Id. Staff are required to wear masks, and "institutions have provided each staff member with a cloth mask for use." Id. Daily updates are provided to all staff members, and personal protection equipment has been provided to all staff. Id. Staff members have been directed to clean all equipment after each shift and throughout the day. Id.

Each institution has plans in place for quarantine if an inmate tests positive. Id. Institutions have resumed groups, religious services, and activities. Id.

6

Employees are advised to stay home if they are sick.  Id.  DOC officials have also reduced the inmate population where they can by maximizing parole releases, reviewing parole detainers for individuals in county jails and state prisons, expediting the release process for anyone with a pending home plan, and reviewing inmates who are beyond their minimum sentences.  Id.  Parole hearings have continued, and parole and reentry continue to follow COVID-19 procedures "under a new normal."  Id.

The DOC represents that on-site vaccination is available to the inmate population and staff at every state correctional institution in Pennsylvania and COVID-19 boosters are available to inmates and staff.

The DOC's demobilization plan addresses various aspects of inmate life, guided by the governor's statewide reopening plans.  See https://www.media.pa.gov/pages/corrections_details.aspx?newsid=463 (last visited Jan. 31, 2022).  Facilities move through the different levels of quarantine depending on the number of positive cases of COVID-19 at the prison at the time.  Id.

II.     **Discussion**

    A.     **Denial of Parole**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  It is well-settled that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," nor has the Commonwealth of Pennsylvania created such a right.  Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7, (1979); see also Burkett v.

Love, 89 F.3d 135, 139 (3d Cir. 1996) (recognizing the general principle that the Pennsylvania parole statute does not create a liberty interest in the right to be paroled); Coady v. Vaughn, 770 A.2d 287, 289 (Pa. 2001) ("It is undisputed that [an inmate] does not have a clear legal right to the grant of parole, nor does the board have a corresponding duty to grant the same.").

The role of a federal court is confined to reviewing the substance of the state parole decision to determine whether the Parole Board exercised its authority in an arbitrary and capricious, or constitutionally impermissible manner. Block v. Potter, 631 F.2d 233, 236 (3d Cir. 1980). Stated simply, the court must evaluate whether the Parole Board abused its discretion. In order to show a violation of substantive due process, the petitioner must demonstrate that: (1) he was arbitrarily denied parole on the basis of impermissible reasons such as race, religion, or political beliefs; or (2) the Parole Board failed to apply appropriate, rational criteria in reaching its determination. Id. at 236. "However, federal courts are not authorized by the due process clause to second-guess parole boards and the requirements of substantive due process are met if there is some basis for the challenged decision." Coady, 251 F.3d at 487. The "relevant level of arbitrariness required to find a substantive due process violation involves not merely action that is unreasonable, but, rather, something more egregious, which we have termed at times 'conscience shocking' or 'deliberately indifferent.'" Hunterson v. DiSabato, 308 F.3d 236, 247 (3d Cir. 2002) (citation omitted).

In the instant case, on May 22, 2020, the Parole Board denied Hagan parole—after interviewing Hagan and reviewing his file—for the following reasons: (1) his

8

institutional behavior, including reported misconducts; (2) his risk and needs assessment indicated that he is a risk to the community; and (3) the negative recommendation made by the DOC. (Doc. 26 at 11). The Parole Board's stated reasons plainly had a substantive and reasonable basis. The record clearly reflects that the Parole Board based its parole determination on factors that it is statutorily required to consider in accordance with 61 Pa. C.S. § 6135. See McGinnis v. Royster, 410 U.S. 263, 277 (1973) (holding that there is a "legitimate desire of the state legislature to afford state prison officials an adequate opportunity to evaluate both an inmate's conduct and his rehabilitative progress before he is eligible for parole"); see also 61 Pa. C.S. § 6137 (granting the Parole Board vast discretion to refuse or deny parole). Under 61 Pa. C.S. § 6135, the Parole Board must evaluate, among other factors: (1) the nature and circumstances of the offense; (2) any recommendations made by the trial judge and prosecuting attorney; (3) the general character and background of the inmate; (4) the notes of testimony of the sentencing hearing, if any, together with such additional information regarding the nature and circumstances of the offense committed for which sentence was imposed; and, (5) the conduct of the person while in prison and his physical, mental and behavioral condition and history and his complete criminal record. Here, the denial of parole was based upon non-arbitrary, statutorily required factors.

It is clear that Hagan disagrees with the Board's conclusions, not the Board's criteria for evaluation. For example, Hagan acknowledges that his institutional behavior was a factor in the denial of his parole. (Doc. 20 at 8). However, he attributes his negative institutional behavior to his mental illness and placement in

solitary confinement. (Id.) While Hagan may disagree with the Board's decision denying him parole, he has not directed the court to any factor relied upon by the Parole Board that could be described as conscience shocking or deliberately indifferent. The Parole Board appropriately relied on a combination of factors to deny Hagan parole. Because Hagan has failed to meet his burden of demonstrating that the Parole Board abused its discretion, the court will dismiss his claim challenging the Board's May 22, 2020 denial of parole.

Hagan also alleges that the Board, in denying his request for review on June 8, 2021, violated the *Ex Post Facto* Clause by applying a parole application factor retroactively. (Doc. 26-1). The *Ex Post Facto* Clause of the United States Constitution "forbids the government from passing any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" PA Prison Soc'y v. Cortes, 622 F.3d 215, 234 (3d Cir. 2010) (quoting Weaver v. Graham, 450 U.S. 24, 28 (1981)). There are two prongs to an *ex post facto* inquiry: "(1) whether there was a change in the law or policy which has been given retrospective effect, and (2) whether the offender was disadvantaged by the change." Richardson v. Pa. Bd. of Prob. & Parole, 423 F.3d 282, 287-88 (3d Cir. 2005) (citing Weaver, 450 U.S. at 29).

"Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of [the *Ex Post Facto* Clause]." Garner v. Jones, 529 U.S. 244, 250 (2000). However, "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." Id. (citing Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 508-09 (1995)). Rather, the

10

controlling inquiry is whether retroactive application of the subject law creates a "sufficient risk of increasing the measure of punishment attached to the covered crimes." Id. (citing Morales, 514 U.S. at 509). A new procedure that creates only a "speculative [and] attenuated risk" of increasing the measure of punishment does not violate the *Ex Post Facto* Clause. Morales, 514 U.S. at 509.

Section 6139(a) of the Pennsylvania Prisons and Parole Code mandates that the Board shall consider an inmate's parole application, as long as it is filed at least one (1) year after the Board's last parole decision concerning that inmate. 61 Pa.C.S. § 6139(a)(2), (3). However, effective November 25, 2020, Section 6139(a) of the Prisons and Parole Code was modified. The 2020 amendment states, in relevant part, as follows:

> (i) Notwithstanding the provisions of paragraphs (2) and (3), if a parole decision has been issued by the board within three years of the date of the current application, the board shall not be required to consider nor dispose of an application by an offender or an offender's attorney in the case of an offender sentenced under any of the following provisions of 18 Pa.C.S. (relating to crimes and offenses):
>
>   Section 2502(c) (relating to murder).

61 Pa.C.S. § 6139(a)(3.3)(i). Thus, prior to the amendment, the Parole Board considered an inmate's case every year. After the amendment, the Board could wait three (3) years between reviews for offenders convicted of murder.

On June 8, 2021, the Board denied Hagan's request for review pursuant to 61 Pa.C.S. § 6139(a)(3.3)(i), stating that it is not required to consider the application for parole submitted by an inmate convicted of murder within three (3) years of the date of a prior parole decision. (Doc. 26 at 7). We will therefore assume that the

11

change in the law brought about by § 6139(a)(3.3)(i) was given retrospective effect that satisfies the first prong of the *ex post facto* inquiry.

Hagan must also meet the second *ex post facto* prong and allege facts showing that the change caused individual disadvantage by creating "a significant risk of increasing his punishment." Richardson, 423 F.3d at 284 (citation omitted). In Morales, the Supreme Court considered whether a California law decreasing the frequency of parole hearings violated the *Ex Post Facto* Clause. Morales, 514 U.S. 499. The Court held that whether a law sufficiently increases a punishment in violation of the *Ex Post Facto* clause is a matter of "degree," and that merely increasing the period of time between parole board hearings did not produce "a sufficient risk of increasing the measure of punishment attached to the covered crimes." Id. at 509. Although increased time between parole hearings could result in more prison time before early release, the Supreme Court found that the change "creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." Id. (citation omitted). Therefore, the Court rejected the inmate's *ex post facto* challenge.

Similarly, in Garner, the Supreme Court considered whether an amendment to a Georgia rule that changed parole reconsideration review procedures violated the *Ex Post Facto* Clause. Garner, 529 U.S. 244. The Supreme Court in Garner stressed that "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." Id. at 250 (citation omitted). Rather, the question is a matter of degree, and the controlling inquiry is

12

"whether retroactive application of the change in [state] law created a sufficient risk of increasing the measure of punishment attached to the covered crimes." Id. (quotation marks and citation omitted). The Court ultimately denied relief and found that the inmate did not present any evidence that retroactive application of the new rule would result in a longer period of incarceration than under the earlier rule and "his claim rest[ed] upon speculation." Id. at 255-56.

Likewise, Hagan has not presented any evidence to show that he would have been granted parole earlier if the new parole policy was not implemented. At best, Hagan cites a speculative possibility that the new parole procedure may increase the length of his incarceration because the Parole Board could wait three (3) years between reviews for offenders convicted of murder. Under these circumstances, Hagan has failed to show that the protections of the *Ex Post Facto* Clause are applicable to him and this claim will be dismissed.

### B.  Eighth Amendment Claim[1]

In his § 2254 petition, Hagan states, in a conclusory fashion, that the conditions of his confinement at SCI-Camp Hill violate the Eighth Amendment. (Doc. 1 at 6). Specifically, Hagan asserts that: (1) his "heart issues and other

---

[1] The United States Court of Appeals for the Third Circuit has held that a state prisoner cannot challenge his conditions of confinement in a habeas corpus action. See Williams v. Sec'y Pa. Dep't of Corr., 459 F. App'x 87, 88-89 (3d Cir. 2012) (nonprecedential) (citing Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002)). The Third Circuit recently concluded that immigration detainees could proceed under 28 U.S.C. § 2241 to challenge allegedly unconstitutional conditions of confinement due to the COVID-19 pandemic. Hope v. Warden York Cnty. Prison, 972 F.3d 310, 324-25 (3d Cir. 2020). However, it did not expressly extend that rule to state prisoners who are in custody pursuant to a criminal judgment. Even if Hagan could challenge his conditions of confinement under § 2254, we find that this claim fails.

physical health problems" make him more vulnerable to contracting COVID-19; (2) the institution is providing inadequate screening and contact tracing for COVID-19; (3) the lockdown for the pandemic exacerbates his depression; and (4) he is receiving inadequate mental health treatment during the lockdown for the pandemic. (Id. at 11-12).

The Eighth Amendment guarantees a prisoner's right to be free from "cruel and unusual punishments" while in custody. See Ricks v. Shover, 891 F.3d 468, 473 (3d Cir. 2018) (quoting Whitley v. Albers, 475 U.S. 312, 318 (1986) (quoting U.S. CONST. amend. VIII)). An Eighth Amendment claim challenging conditions of confinement has two elements: (1) the deprivation asserted must be "sufficiently serious" to violate the Constitution, and (2) the prison official or officials responsible for the deprivation "must have a sufficiently culpable state of mind." Thomas v. Tice, 948 F.3d 133, 138 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). An inmate satisfies the first element by showing that he is deprived of "the minimal civilized measure of life's necessities." Id. (citation omitted). The second element can be proven by establishing that prison officials "acted with deliberate indifference to the inmate's health or safety or [to] conditions of confinement that violated the inmate's constitutional rights." Id. (citation omitted). Stated differently, prison officials must "both know of and disregard an excessive risk to inmate health or safety" or a violation of the inmate's constitutional rights. Mammana v. Fed. Bureau of Prisons, 934 F.3d 368, 373 (3d Cir. 2019) (citations omitted).

As we have previously recognized, "the prison setting raises unique concerns regarding the spread of the COVID-19 virus since, by their very nature, prisons are confined spaces unsuited for social distancing." Rodriguez-Francisco v. White, No. 1:20-CV-1076, 2020 WL 4260766, at *3 (M.D. Pa. July 24, 2020).  However, the "inability to practice social distancing is not, in and of itself, sufficiently serious to implicate a violation of the Eighth Amendment." Id.  There is no indication in the record that SCI-Camp Hill is not complying with the modified parameters of operation set forth *supra*.  Hagan has provided no evidence to support his claim that the prison's response to the COVID-19 pandemic has exacerbated his mental health or heart condition.  Moreover, Hagan has been offered but has refused appropriate vaccination.  Hence, his claims of mental health injury are weakened by his own rejection of a scientifically and medically proven procedure to substantially lessen the risk of severe COVID-19 infection.

Additionally, SCI-Camp Hill has been testing for the COVID-19 virus.  As of January 31, 2022, 21,975 inmates have been tested, with 1,053 positive results.  See COVID-19 and the DOC, https://www.cor.pa.gov/PAges/COVID-19.aspx (select "COVID-19 Dashboard" hyperlink and search for SCI-Camp Hill) (last visited Jan. 31, 2022).  Staff members have also been tested, with 453 testing positive.  Id. Finally, as of January 31, 2022, 1,685 inmates and 474 staff members at SCI-Camp Hill have been fully vaccinated.  Id.  Thus, even when considering Hagan's underlying mental health condition and heart condition, he has neither identified a sufficiently serious deprivation that rises to the level of an Eighth Amendment violation nor has he established that officials at SCI-Camp Hill have acted with

15

deliberate indifference to his health or safety. See Hope v. Warden York Cnty. Prison, 972 F.3d 310, 330 (3d Cir. 2020) (noting that "a failure to eliminate all risk [does not] establish that the Government [has been] deliberately indifferent to [inmates'] serious medical needs"); Rodriguez-Francisco, 2020 WL 4260766, at *5 (concluding that habeas relief was not warranted because prison officials were "well aware of the COVID-19 pandemic and ha[d] taken numerous steps to mitigate the risk of infection and spread in their facility"). Because Hagan has failed to identify any official conduct that exhibits deliberate indifference to his health or safety, he is not entitled to habeas relief.

### III.  Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). As the Supreme Court has explained,

> [w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

16

Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Hagan failed to demonstrate that a certificate of appealability should issue.

**IV.     Conclusion**

We will grant respondents' motion (Doc. 13) and dismiss the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:      February 2, 2022